In re **STANDARD FINANCIAL MANAGEMENT CORP., d/b/a New England Rare Coin Galleries, Debtor.**

**Bankruptcy No. 87–10219–HAL.**

United States Bankruptcy Court, D. Massachusetts.

July 16, 1987.

James E. McGuire, William R. Baldiga, Thomas Bean, Brown, Rudnick, Freed & Gesmer, Boston, Mass., for Sp. Counsel, Joseph Ryan.

R. Robert Popeo, Peter A. Biagetti, Tracy A. Miner, Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., Boston, Mass., for Dana Willis.

James C. Gross, Friedman & Atherton, Boston, Mass., for Irving Willis.

Herbert C. Kahn, Kahn & McKenzie, Boston, Mass., for Creditors' Committee.

Stephen M. Richmond, Kaye, Fialkow, R & R, Boston, Mass., for Law Firm of Kaye, Fialkow, Richmond & Rothstein.

Victor J. Polk, Bingham, Dana & Gould, Boston, Mass., for Paul Taglione.

## MEMORANDUM RE FEDERAL EXPRESS ENVELOPE AND CONTENTS

HAROLD LAVIEN, Bankruptcy Judge.

Discovery motions, objections, apparent agreements and orders and then a second round or maybe even a third round, seem to be the pruritus that constantly needs scratching in this case. However, the present batch of motions, objections and counter motions have one distinguishing important feature. They are not generalized, and deal with specific items, namely, two letters from the law firm of Kaye, Fialkow, Richmond & Rothstein ("Kaye Fialkow") and one Federal Express envelope and its contents that is described in the two letters.

The law firm of Kaye Fialkow appears to be embarrassed by the appearance of these two letters that it wrote to counsel from whom it sought an ethical opinion as to its responsibility under an attorney/client privilege. The law firm represented both the corporation, Standard Financial Management, now the debtor, on behalf of whom the attorney/client privilege has been waived, and Dana J. Willis, individually, ("Willis") the president and sole stockholder of the debtor, who insists on maintaining his attorney/client privilege. By stipulation between Kaye Fialkow, special counsel for the debtor, and (the law firm presently representing Willis, individually) Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C. ("Mintz Levin"), files dealing with the debtor and Willis that were in the possession of Kaye Fialkow have been turned over to Mintz Levin who agrees to be bound by any order against Kaye Fialkow and to deal with the discovery problems. But for the stipulation, it is doubtful that Kaye Fialkow could transfer its responsibil-

ities. *See, In re Grand Jury Subpoena Duces Tecum,* 391 F.Supp. 1029 (S.D.N.Y. 1975). In addition to the attorney/client argument, counsel for Paul Taglione, a former employee, vice president and chief numismatist, objects to production on Fourth Amendment and Article XIV of the Massachusetts Constitution grounds.

In order to understand this objection and to put the various positions into context, a brief description of the facts is necessary. On March 6, 1986, two Federal Express overnight envelopes were delivered to the debtor's place of business. One was addressed to Paul Taglione at the business address and, presumably, dealt with debtor's business matters. The other was addressed to Paul Taglione at his home address. No explanation was offered as to why, instead, it was delivered to the debtor's office. This second envelope contained $3,000 in one hundred ($100) dollar bills. Both envelopes came from a Kevin Lipton, a customer of the debtor. Paul Taglione's position with the debtor had been terminated at about the time the two envelopes were delivered. Willis, the president, chief operating officer and sole stockholder of the debtor, opened both envelopes. Although he took the stand at his counsel's request, he then declined on the basis of the Fifth Amendment to answer questions on cross-examination as to anything to do with the envelopes, including why he opened them, or even that he had opened them, or whether or not he discussed the envelopes with counsel.

In any event, the envelopes next appeared in the hands of Scott Semal who was general counsel for the debtor. Mr. Semal's office was within the corporate headquarters. Willis testified on direct in answer to his own counsel's questions that Semal was hired under an arrangement that allowed for a limited private practice and that Willis consulted him on personal as well as corporate matters for which he was sometimes personally billed, and that he consulted Semal on March 6, 1986 on personal matters, which he expected to be treated confidentially. No mention, however, was made of the subject matter of the personal consultation or of the envelopes in

his direct testimony and, as previously indicated, he declined on the basis of the Fifth Amendment to connect the envelopes with any activity by himself. Semal was not called to testify. Special Counsel for the debtor called as a witness one Elizabeth Lipton, no relation to the customer who had sent the envelopes, who was an attorney for debtor on Semal's staff. She testified that she had no discussion with Willis relative to the envelopes. Semal handed them to her with the instructions to bring to Kaye Fialkow to have it put into their safe, and not to discuss the matter with any other people. Since the envelope was open, she saw the contents when it was handed over to her. She brought the envelope to Kaye Fialkow where she observed the secretary log in the envelope and put it in the safe. Later, she went back to Kaye Fialkow, at Semal's request, to copy the envelope and, on her own, she copied the money and then gave the copies to Semal in the presence of one Phil Manuel, a private investigator from Washington, D.C. At all times, she had no reason to believe she or her boss, Mr. Semal, was acting other than on corporate business. In fact, she placed on the outside of the cover envelope, before giving it to Kaye Fialkow, the words "New England Rare Coin Galleries Lisa Lipton, Esquire". Her testimony was interrupted during Willis' counsel's cross-examination by her request to retain her own counsel. All counsel present, agreed to continuing her examination to July 22nd at 2:00 P.M. Counsel was then asked if the Court's ruling on the various motions need await her further examination and if so, what relevant facts might be elicited from her. No offer of any relevant testimony that Ms. Lipton could offer was proffered.

Special Counsel for the debtor filed an Emergency Motion and Memorandum to Compel Production and the Award of Expenses, seeking the Federal Express Envelope and its contents, namely, the Three Thousand ($3000) Dollars. Attached to the motion were two letters from Kaye Fialkow to their counsel outlining the facts as previously stated and seeking an ethical

opinion. Special Counsel's motion resulted in a flurry of objections and counter-motions.

Kaye Fialkow filed an Emergency Motion for the Return of All Copies of Letters Dated March 16 and 24, 1987 and sought to compel the maintenance of confidentiality of the contents of said letters. The motion was based on their surprise that Special Counsel had copies of what they considered confidential communications.

Mintz Levin filed Motions to Exclude Evidence, referring to both of the letters. They also filed an Opposition of Dana Willis and Mintz Levin to Special Counsel's Motion to Compel the Production of the Federal Express Envelope, based on personal attorney/client privilege and Fifth Amendment privileges.

Counsel for Taglione did not file any pleadings, but appeared at the June 23rd hearing and objected to production of the Federal Express envelope addressed to his client at his home, on the basis of an illegal search under the Fourth Amendment of the United States Constitution and Article XIV of the Massachusetts Constitution. Counsel's attempts to cross-examine Willis were met with Fifth Amendment objections. The parties were given until June 30th to file Memoranda on the applicability of this illegal search argument.

It is unlikely that any of this would have come to light but for the information contained in the two Kaye Fialkow letters. So that as a threshold matter, counsel for Willis has argued that I should consider the motions to return them, exclude them and their contents as evidence, or as the source of evidence and, therefore, any basis of the Special Counsel to deal with the Federal Express envelope would also be removed.

In answer to how these two letters came into Special Counsel's hands, counsel filed three affidavits and summarized their contents. It appears that twice by agreement, Special Counsel's personnel went to Kaye Fialkow's offices where they were shown boxes of documents that Kaye Fialkow made available as a result of Special Counsel's waiver of the corporate privilege. No one disputes Special Counsel's authority to

waive the corporate attorney/client privilege, *see, Commodity Futures Trading Commission v. Weintraub*, 471 U.S. 343, 105 S.Ct. 1986, 85 L.Ed.2d 372 (1985), 11 U.C.S. § 1107(a). Special Counsel's representatives numbered, or otherwise tabbed, the documents they wanted copies. The two letters in question were not among the documents submitted for examination. They were not seen by Special Counsel's people nor were they numbered, or otherwise tabbed. Special Counsel received them among the documents sent to them from the outside copying firm to which Kaye Fialkow had sent the requested documents to be copied. Neither Kaye Fialkow nor Special Counsel has any explanation as to how or why these two letters were included among the documents sent to the copy center. Whatever the explanation, Kaye Fialkow maintains they had no intention of disclosing these documents, and filed their emergency motion for their return, both on the basis of a confidential communication between the law firm and its counsel and that the letters contained information communicated to them as to which Willis, individually, claims an attorney/client privilege. No brief, affidavit, or further participation was taken by Kaye Fialkow at the hearing other than to orally, formally repeat their motion and then withdraw, leaving the matter in the hands of Willis' present counsel. Thereby indicating, as do the letters, that their real concern is in not appearing to have been responsible for the breach of any attorney/client privilege of Willis, individually.

Thus, ultimately, the real question as to both the letters and the envelope with its $3,000 is the standing of Willis to raise either a Fifth Amendment or attorney/client privilege.

■ Willis, understandably, does not push the Fifth Amendment claim in either argument or brief, since he is not in possession of the documents and he is not the one being asked to produce them, nor were any of the items his. The Fifth Amendment is a personal right not to testify and does not stretch to documents or items in the hands of others. *United States v. Doe*, 465 U.S.

605, 610, 104 S.Ct. 1237, 1240–41, 79 L.Ed.2d 552 (1984); *Fisher v. United States*, 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976); *Couch v. United States*, 409 U.S. 322, 329, 93 S.Ct. 611, 616, 34 L.Ed.2d 548 (1973).

Willis' reliance is principally on the attorney/client privilege and he argues the privilege vigorously. While this is a more difficult issue, it stands on little better footing. The basic rationale of the attorney/client privilege is succinctly set forth by Judge Wyzanski, Jr. in *United States v. United Shoe Machinery Corp.*, 89 F.Supp. 357 (D.Mass.1950).

The rule which allows a client to prevent the disclosure of information which he gave to his attorney for the purpose of securing legal assistance is founded upon the belief that it is necessary "in the interest and administration of justice". *Hunt v. Blackburn*, 128 U.S. 464, 470, 9 S.Ct. 125, 127, 32 L.Ed. 488. As stated in the Comment to Rule 210 of the A.L.I. Model Code of Evidence: "In a society as complicated in structure as ours and governed by laws as complex and detailed as those imposed upon us, expert legal advice is essential. To the furnishing of such advice the fullest freedom and honesty of communication of pertinent facts is a prerequisite. To induce *clients* to make such communications, the privilege to prevent their later disclosure is said by courts and commentators to be a necessity. The social good derived from the proper performance of the functions of lawyers acting for their clients is believed to outweigh the harm that may come from the suppression of the evidence in specific cases." [Emphasis added.] But the privilege should be strictly construed in accordance with its object. *People's Bank v. Brown*, 3 Cir., 112 F. 652.

The *United Shoe* rationale may be simple to apply when one individual seeks the advice of his personal attorney or firm about a strictly personal problem. However, it requires considerably more elaboration when the individual is also sole stockholder, president, and principal functionary of the corporation discussing a problem of vital interest to the corporation and, possibly, in some presently undefined manner to him, individually, with corporate counsel who, also, represents him individually in various real estate, investment, and other personal matters.

■ This is, as one would expect, not a unique situation, and courts that have dealt with it have recognized that if even in the relatively simple situation there is a need to assure that "But the privilege should be strictly construed in accordance with its object", *United States v. United Shoe Machinery Corp., supra*, and that would be even more so in a situation so susceptible to subterfuge. Without some more objective criteria, the waiver of corporate privilege could be made meaningless since, of course, a corporation can only act through individuals who could then, even as an afterthought once trouble developed, claim that the individual attorney/client privilege should prevail. On the other hand, the mere fact that the individual is the corporate spokesman should not per se eliminate the possibility of an individual attorney/client privilege, even in cases where good judgment might indicate the wisdom of obtaining separate personal counsel.

■ A reasonable balancing of these considerations is provided in *In re Grand Jury Investigation*, 575 F.Supp. 777 (N.D. Ga.1983). In order to claim an individual as opposed to a corporate attorney/client privilege, when corporate officers approach corporate counsel for personal legal advice, it must be explicitly made clear to counsel that the advice is sought individually rather than in a corporate capacity. Corporate counsel must be willing to proceed in the face of what may be a serious conflict of interest. The individual must intend and counsel must be willing, despite the conflict, to keep the communication confidential. Most important, because of that conflict, the consultation cannot concern matters relating to the individual's official duties or the general affairs of the corporation. The Court noted that certain courts have solved the problem by flatly rejecting an employee's right to the privilege once there is a corporate waiver. *See, Citibank,*

*N.A. v. Andros,* 666 F.2d 1192, 1195 (8th Cir.1981); *United States v. Piccini,* 412 F.2d 591, 593 (2d Cir.1969), *cert. denied,* 397 U.S. 917, 90 S.Ct. 923, 25 L.Ed.2d 98 (1970); *In re OPM Leasing Services, Inc.,* 13 B.R. 64, 67–68 & n. 11 (S.D.N.Y.1981), *aff'd,* 670 F.2d 383 (2d Cir.1982); *United States v. De Lillo,* 448 F.Supp. 840, 842–43 (E.D.N.Y.1978); *In re Grand Jury Proceedings, Detroit, Michigan,* 434 F.Supp. 648, 650 (E.D.Mich.1977) (Joiner, J.), *aff'd,* 570 F.2d 562, 563 (6th Cir.1978); *In re Grand Jury Subpoena Duces Tecum,* 391 F.Supp. 1029, 1033–34 (S.D.N.Y.1975); *In re Blier Cedar Co.,* 10 B.R. 993, 997 n. 5 (D.Me., 1981).

The court in *In re Grand Jury Investigation,* distinguishes the *Vesco* case on which Willis heavily relies by pointing out that even in *In re Grand Jury Subpoena Duces Tecum,* 391 F.Supp. 1029 (S.D.N.Y. 1975), *Vesco's,* privilege was considered waived to the extent that *Vesco's* communications reflected his official duties. Also, it should be noted that in *Vesco,* there had been a full Securities and Exchange Commission investigation at which counsel had represented both the individual and the corporation, and now the Grand Jury sought from the attorney his files concerning the S.E.C. investigation. Despite this much stronger showing, the court held:

> That privilege does not encompass an inchoate right to withhold documents merely because an attorney/client relationship existed. *Cf. United States v. Hodgson,* 492 F.2d 1175, 1177 (10th Cir. 1974) ... Therefore, although the policy underlying attorney-client privilege is given effect, the privilege is strictly limited in purpose and effect, and the party asserting the privilege has the burden of establishing every essential element of his claim. Page 1033.

\*      \*      \*      \*      \*      \*

The corporation has waived its privilege and since a corporation can act only through its officers, *Vesco* cannot assert the attorney-client privilege as to matters involving the affairs of the ICC or embracing his role or activities as an ICC officer or director. Page 1034.

In the proceeding before this Court, Willis has taken the Fifth Amendment on all questions dealing with the envelope and has merely testified that Semal, as corporate counsel, also handled some personal matters, and that he discussed some personal matters with Semal on March 6th. There is nothing more as to Kaye Fialkow. In fact, the FTC matters were being handled by other counsel. The matter of an employee potentially receiving kickbacks was, clearly, a corporate matter that the president, in his official capacity, should be concerned with and would, quite naturally, be consulting with corporate counsel, and even turning potential evidence over to corporate counsel for safekeeping. Semal's instructions to Ms. Lipton not to tell anyone about the envelope was perfectly consistent with corporate investigation of the potential breath to which this employee's defalcation extended. Ms. Lipton had every reason to believe that this was a corporate matter. The letter of March 16, 1987 from Kaye Fialkow refers explicitly to "an envelope that was given to us by a corporate client." The topic of the letter of March 24 is indicated as "Re Standard Financial Management Corp." The narrative apparently indicates, Mr. Willis telling Kaye Fialkow that he "opened both Federal Express packages assuming them to be routine business matters inasmuch as the sender was a supplier." Incidentally, Attorney Cutler, to the extent he enters the matter, is described in the same letter as being recommended as corporate FTC counsel. Also, the container envelope, when the material was delivered to Kaye Fialkow, had the words "New England Rare Coin Galleries Lisa Lipton, Esquire."

In short, Willis has not only failed to carry the burden showing any personal, as opposed to corporate, attorney/client privilege in regard to the Federal Express envelopes in his discussion with Semal as house counsel, he has not shown any such relationship with Attorney Cutler or Kaye Fialkow. Further, nothing revealed in the letters deals with any confidential matter concerning Willis, per se, and certainly, any rights to the envelope. The contents of the

envelope rest with either the addressee, Mr. Taglione, or, more likely, with the corporation.

Since all other issues are irrelevant to determine the motions before me, I will only briefly discuss the issue of Kaye Fialkow's letters being unintentionally turned over to counsel and whether or not that is enough to waive the attorney/client privilege. Support for both sides of that position is abundant from respected authorities. An analysis in support of the waiver of the privilege even by an inadvertent disclosure which also distinguishes the opposite view is found in *Chubb Intergrated Systems, Ltd v. The National Bank of Washington, et al*, 103 F.R.D. 52 at 79–81 (D.C.1984) by Magistrate Jean F. Dwyer. The opinion cites the leading cases and authorities on both sides of the issue and it distinguishes the cases cited by Willis, including the impressive argument of *Mendenhall v. Barber-Greene Co.*, 531 F.Supp. 951 (N.D.Ill.1982); *Connecticut Mutual Life Insurance Co. v. Shields*, 18 F.R.D. 448, 451 (S.D.N.Y.1955); *TCC v. IBM*, 573 F.2d 646, 648 (9th Cir.1978). Both views find support among the commentators. *See*, generally in support of waiver, 8 J. Wigmore, Evidence, § 2327 at 635 (McNaughton Rev.1961) and J. McCormick, Evidence, § 93 at 194 (1972 Cleary). Opposed to the finding of a waiver, *see* 3 Jones on Evidence, § 21:22 at 804 n. 14 (6th ed. 1972).

There appears to be no controlling First Circuit case on the exact question of waiver by inadvertent disclosure. However, the issue becomes academic since there was no proof of Willis holding the necessary personal attorney/client relationship to avoid the corporate waiver. I would note, however, in passing that while each side of the inadvertent disclosure argument makes strong theoretical arguments, in the real world, unforced disclosure is disclosure and should support the waiver argument. Otherwise, immunity is too easily obtained for damaging documents and the facts contained therein, by simply deliberately arranging an accidental disclosure. Further, mistake or inadvertence is, after all, merely a euphemism for negligence and, certainly, pre and post 1787, one is expected to pay a price for one's negligent actions.

Finally, to be considered, are the arguments of Taglione based on the Fourth Amendment[1] of the United States Constitution and Article XIV[2] of the Massachusetts Constitution. The wording is substantially the same and neither party makes any separate argument in their briefs, so that the Court will deal with the interpretations of both provisions as governed by the same principles.

■ The cases make it clear that the protection against illegal search and seizure is directed against official and not private intrusions, *Hoffa v. United States*, 385 U.S. 293, 301, 87 S.Ct. 408, 413, 17 L.Ed.2d 374 (1966) (a tape recording not inadmissible though made in violation of FCC provisions). The position is stated in very strong terms in *United States v. McGuire*, 381 F.2d 306 (2nd Cir.1967).

> Assuming that Wolfe stole the records and Wolfe has got the records and government goes to Wolfe and says 'will you give us the stolen records,' I don't see anything violative of anybody's constitutional rights in that.

That ruling was held proper under the rationale of *Burdeau v. McDowell*, 256 U.S.

---

**1.** *Amendment IV.*

    The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

**2.** *Art. XIV. Freedom from unreasonable searches and seizures; warrants*

    ART. XIV. Every subject has a right to be secure from all unreasonable searches, and seizures, of his person, his houses, his papers, and all his possessions. All warrants, therefore, are contrary to this right, if the cause or foundation of them be not previously supported by oath or affirmation; and if the order in the warrant to a civil officer, to make search in suspected places, or to arrest one or more suspected persons, or to seize their property, be not accompanied with a special designation of the persons or objects of search, arrest, or seizure: and no warrant ought to be issued but in cases, and with the formalities prescribed by the laws.

465, 41 S.Ct. 574, 13 A.L.R. 1159, 65 L.Ed. 1048 (1921) footnote 5, limiting the Fourth Amendment to official illegal search and seizure.

■ In the proceeding presently before the Court, there was no governmental involvement shown. The discovery is being sought in a bankruptcy case in which the government is not a party. The envelope may well have been improperly opened since it was addressed to an individual at his home; however, it was delivered to the debtor's business along with other business envelopes, also addressed to the individual all from a known business customer. Mr. Willis, having taken the Fifth Amendment, we have no direct evidence of intent, but certainly his actions in opening the envelope was as consistent with a simple mistaken concern with business mail as anything more devious. All of Willis' further actions, as already discussed, were perfectly consistent with his official role as president, faced with a serious potential defalcation by one of the corporate employees that merited further discreet inquiry and legal consultations. Mr. Taglione chose not to testify and therefore, we can no more credit his alleged ignorance of receipt of the envelope and its contents, as alleged in counsel's memorandum, than we can of Willis' account as relayed in the Kaye Fialkow letter that Willis, in fact, confronted Taglione with the envelope and its contents and that Taglione, in fact, explained the $3,000 as repayment of a loan. It was certainly proper for Willis as president, on behalf of the debtor corporation, to retain the evidence of potential employee malfeasance. In fact, the issue may more properly not be one of discovery but, rather, the effort by the debtor corporation to recover its own property. *See, In re Leasing Consultants, Inc.,* 592 F.2d 103 (2nd Cir.1979); *Bernstein v. IDT Corporation,* 638 F.Supp. 916 (S.D.N.Y.1986).

Taglione recognizes the need for somehow involving the government in Willis' opening and arranging for the retention of the envelope and its contents and stretches to cite criminal cases with readily established government complicity.

*Silverthorne Lumber Co., Inc., et al v. United States,* 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920) was an appropriate vehicle for Justice Holmes to express his indignation but, is totally inapposite to the present matter. From beginning to end, the government promoted the skulduggery. The officers were arrested and while detained, their corporation's office was raided without proper warrant authority. Copies of the incriminating records were made and, after admitting to the illegal search, the originals only were returned and then, based on the retained copies, proper subpoenas were issued for the originals to be brought to the Grand Jury. Even in this case, Justice Holmes' opinion, which is understandably critical of this Fourth Amendment abuse, starts with the statement, "This case is not that of knowledge acquired through the wrongful act of a stranger, ..."

In *United States v. Stein,* 322 F.Supp. 346 (N.D.Ill.E.D.1971), again, a criminal case, the individual had already tried to make a deal by turning over papers which the Grand Jury rejected as not helpful; however, the defendant's conversation with the prosecutors left a definite impression that if he got the right papers, an arrangement could be reached. In this criminal matter pending before the Grand Jury, the individual was clearly encouraged to produce more documents. Again, the opinion stressed that the Fourth Amendment does not apply when the government is not involved in the original obtaining of possession of records. *United States v. McGuire,* 381 F.2d 306 (2nd Cir.1967). The present case is a non-criminal bankruptcy case. The documents and cash which may rightly belong to the estate, in any event, is being sought by special counsel acting as a trustee in bankruptcy. Compare this with yet another criminal case cited by Taglione, *United States v. Bloom,* 450 F.Supp. 323 (E.D.Pa.1978). The opinion again makes it clear that an improper search by a private party is not a Fourth Amendment violation, citing again, *Burdeau v. McDowell,* 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048 (1920) and *United States v. Goldberg,* 330 F.2d 30 (3rd Cir.1964), *cert. denied,* 377 U.S. 953,

84 S.Ct. 1630, 12 L.Ed.2d 497. Here, supervisors of the employer went through the desks of two recently discharged employees and turned over the information to the S.E.C. In the *Goldberg* case, a business associate took defendant's records to the police without defendant's knowledge and, in both cases, no Fourth Amendment violation was held to exist.

Thus, only in extreme cases where it is obvious that an individual third party actually is but a screen for what is, in reality, a government promoted search, the Fourth Amendment has been applied. The evidence has to be fairly strong to develop a circumstantial case as in the *Silverthorne* or *Stein* cases, *supra*, and cannot rest on the gossamer thread of discovery in a bankruptcy case of potential kickbacks. There must be more than unsubstantiated speculation proposed by Taglione, that because of the Federal Trade Commission ("FTC") investigation of the business practices of the corporation and its employees under way on March 6, 1986, Willis, the principal in this debtor, concocted the thought when he saw this envelope along with all of the other business envelopes, that there was something improper in it, and if he opened it, he may be able to use it as a bargaining chip and, as the big fish, get a break by tossing in the little fish. It is not only too speculative to characterize this as a search encouraged by the government, but carried to its speculative conclusion, Willis might have just the opposite interest. That is, if he had a reasonable suspicion as to what was likely to be in the envelope, he might very well have wanted to prevent it from falling into the trustee's hands, as it might open the trail to an extensive pattern of kickbacks and a larger recovery to the estate in claims against all concerned.

Sufficient credible evidence has not been presented by Taglione that by presumption or otherwise would satisfy a finding that the government participated, induced or, otherwise, encouraged Willis to open the envelope in question or to, subsequently, turn it over to corporate counsel. Willis' vigorous attempts to prevent the turnover of the envelope and its contents are, as a matter of fact, consistent with the view that Willis was not acting in any form of government frolic.

The corporation, has waived any attorney/client privilege. Willis has no independent individual attorney/client privilege in the Federal Express envelope, the $3,000 contents, and the two Kaye Fialkow letters.

The various motions and objections dealing with seeking to prevent the production of the Federal Express envelope and the $3,000 are denied.

Kaye Fialkow or their surrogate, Mintz Cohn, are ordered to turn the envelope and its contents which, presumably, are thirty (30) one hundred ($100) dollar bills, over to Special Counsel, forthwith.