## INTERNATIONAL DIGITAL SYSTEMS CORPORATION,

v.

## DIGITAL EQUIPMENT CORPORATION.

### Civ. A. No. 87–0536–S.

United States District Court, D. Massachusetts.

June 6, 1988.

---

Joel Lewin, Dennis M. Ryan, Elissa Tonkin, Hinckley, Allen, Snyder & Comen, Boston, Mass., for plaintiff.

Robert J. Stillman, William L. Patton, Ropes & Gray, Boston, Mass., for defendant.

## MEMORANDUM AND ORDER ON INTERNATIONAL DIGITAL SYSTEMS CORPORATION'S MOTION FOR PROTECTIVE ORDER (# 36)

ROBERT B. COLLINGS, United States Magistrate.

The plaintiff International Digital Systems Corporation (hereinafter, "IDSC") seeks a protective order compelling the defendant, Digital Equipment Corporation (hereinafter, "DEC"), to return copies of twenty documents which are protected by the attorney-client privilege but which IDSC turned over to DEC, allegedly inadvertently, as part of the document production in this case. The issue is whether the disclosure by IDSC is to be held to be a waiver of the privilege as to the documents disclosed.

There is no dispute that the documents are protected by the attorney-client privilege if the privilege has not been waived. There is also no dispute that the disclosure was "inadvertent," at least in the sense that it was not an intentional or purposeful disclosure. From this it follows that IDSC did not disclose the documents for the purpose of gaining an advantage for itself, or, put another way, for "offensive" purposes. See AMCA International Corporation v. Phipard, 107 F.R.D. 39, 43–44 (D.Mass., 1985).[1]

DEC served the request for documents in May, 1987. IDSC claims that the request was very broad and necessitated a review of 500,000 of IDSC's documents. The sorting, reviewing and copying of the requested documents was supervised by Attorney Gary A. Cohen who was assisted by three paralegals from his law firm[2] and the entire staff of IDSC comprising thirteen employees. A week after receipt of the document request, IDSC moved its offices to another location in Manchester, New Hampshire; so far as appears, no review of documents began until after the move to the new location.

In the new location, a conference room was set aside as a central area where documents could be reviewed and copied. The three paralegals were instructed by Attorney Cohen as to the "parameters" of the

---

1. DEC claims that the disclosure operated not only as a waiver of the documents actually disclosed but also as to undisclosed documents otherwise subject to the privilege but which bear on the same subject-matter. I rejected DEC's claim in this regard by an endorsement on its motion to compel dated May 31, 1988 denying the motion; I can find no case in which an unintentional or inadvertent disclosure has been found to be a waiver of the privilege as to undisclosed documents concerning the same

subject matter. See Standard Chartered Bank PLC v. Ayala International Holdings, 111 F.R.D. 76, 85 (S.D.N.Y., 1986); Parkway Gallery v. Kittinger/Pennsylvania House Group, Inc., 116 F.R. D. 46, 53 (M.D.N.C., 1987).

2. The law firm which represented the plaintiff at the time at which the document production took place is not the same law firm which presently represents the plaintiff.

work product rule and the attorney-client privilege and were instructed to "err on the side of caution" in choosing documents which should be withheld. Affidavit of Attorney Gary A. Cohen, Etc. (# 38) at ¶ 9. The paralegals affixed different colored "post-its" to documents which were to be withheld or to documents about which they had questions. When the documents were copied, the "post-its" were affixed to the copies which were then shipped to the office of Attorney Cohen's law firm in Boston. Pink "post-its" were affixed to documents which were to be withheld on grounds of work product or attorney-client privilege; yellow "post-its" were placed on documents as to which the paralegals had questions. Affidavit, Etc. (# 38) at ¶ 13.

By late August, 1987, copies of all relevant documents in IDSC's possession, both privileged and unprivileged, had been assembled in the law firm's Boston office; the documents totalled ninety cases. The entire set of copies was then shipped to Sir Speedy, a professional copying company, to be Bates-stamped and duplicated in identical form. In September, the duplicate set of copies was returned to the law firm's office, with the documents bearing the same labels as to what was privileged. Affidavit, Etc. (# 38) at ¶¶ 18–19.

So far as I can glean from Attorney Cohen's affidavit, no segregation of attorney-client or work product material was made until after Sir Speedy had Bates-stamped the copies which had been shipped to the law firm and had then made a duplicate set of those documents. In other words, it was only the pink or yellow "post-its" on the copies which had been shipped from Manchester to the law firm which identified documents which would be withheld.

Attorney Cohen avers that the "last phase of screening" for privileged documents took place under his supervision and comprised two steps:

First, the complete document index prepared by the paralegals during the New Hampshire phase was reviewed. This review, together with an examination of the boxes which were marked with "Post-it" stickers, confirmed that privileged documents were concentrated in groups distributed throughout the ninety cartons we were preparing to produce. Next, the entire contents of every folder identified by sticker as containing one or more pages of privileged matter was carefully reviewed again. As a result of this two-part screening process, approximately 2,600 documents were withheld on grounds of privilege.

Affidavit, Etc. (# 38) at ¶ 20.

From this I gather that there was no plenary review of all the documents to cull out those which had pink or yellow "post-its" on them. Instead, reliance was placed on the "document index." However, there is nothing in Attorney Cohen's affidavit which indicates that the indices contained any notations as to whether a document was privileged or not; the only notation which is mentioned is the affixing of the pink or yellow "post-it" to the document itself. Next, Attorney Cohen speaks of examining "boxes" with "post-it" stickers on them. This is the first mention of any "post-it" stickers going on boxes in which privileged documents were kept; the only previous mention is of "post-its" being affixed to the documents themselves. Then he avers that "... the entire contents of every folder identified by sticker as containing one or more pages of privileged matter was carefully reviewed again" [and] "[a]s a result of this two-part screening process, approximately 2,600 documents were withheld on grounds of privilege." The problem with this explanation is that there is nothing in the affidavit to indicate that "folders" were marked with "post-its" if they contained privileged documents. As I stated, the only marking as to privileged documents which is mentioned in the affidavit is the placing of pink or yellow "post-its" *on the documents themselves,* not on "folders" or "boxes."

In sum, Attorney Cohen seems to have relied on "post-its" put on "folders" and/or "boxes" to determine whether or not any privileged documents were contained in the "folder" and/or "box." However, his affidavit contains no information as to how

these "post-its" came to be applied to the folders and/or boxes, by whom, and at what stage of the process. In addition, there is no description of how the privileged documents were removed from the copies which Sir Speedy made and which were to be turned over to DEC; presumably, these copies did not contain "post-its." Perhaps the privileged documents were culled from the original copies by "post-its" and then the documents with the same Bates numbers were culled from the copies Sir Speedy made. I am not told.

What is clear is that DEC received twenty documents comprising eighty-eight pages which were privileged and confidential. DEC represents that all of the documents came from one of the boxes, i.e., the box which was numbered 42. The eighty-eight pages of documents have been submitted to the Court as Exhibit C to the Affidavit Of Robert Stillman (# 41).[3] The documents should have appeared to any paralegal as being privileged. One document, comprising twenty-five pages, is a transcript of an interview of IDSC's President conducted by Attorney Cohen himself; several other documents are enclosures to cover letters written on the law firm's stationery. There is also a thirty-two page draft complaint in this action with commentary.

If the first step in the process was a review of the document index prepared by the paralegals, I do not see how these documents could have been overlooked if the description of the documents by the paralegals was even close to the mark.

However, going on to step two, the most likely explanation for the failure to cull out these documents is that the pink or yellow "post-it" which was on the "box" numbered 42 was either never put on the box, or was mistakenly removed, or was overlooked. This would seem to explain the fact that all

the privileged documents which were produced were found in that box.

The law to be applied to the question as to whether there has been a waiver of the privilege by inadvertent disclosure is not uniform, and there does not appear to be any controlling First Circuit case on the question. *In Re Standard Financial Management Corp.*, 77 B.R. 324, 330 (Bkrtcy, D.Mass., 1987); *Transamerica Computer Company, Inc. v. International Business Machines Corp.*, 573 F.2d 646, 650 (9 Cir., 1978).[4]

In *Connecticut Mutual Life Insurance Co. v. Shields*, 18 F.R.D. 448, 451 (S.D. N.Y., 1955), the Court seems to hold that inadvertent disclosure can never result in a waiver because if the disclosure was inadvertent, there was no intention to waive the privilege and that one cannot waive the privilege without intending to do so. To the same effect is *Kansas–Nebraska Natural Gas v. Marathon Oil Company*, 109 F.R.D. 12, 21 (D.Neb., 1983) in which the Court seems to indicate that an "inadvertent" disclosure would not operate as a waiver of the privilege unless the "failure to catch" a document prior to production of a mass of documents was a "deliberate" act or "the result of conscious but erroneous decision."

On the other hand, the Court in *Underwater Storage, Inc. v. United States Rubber Co.*, 314 F.Supp. 546, 548–49 (D.D.C., 1970), in response to a claim of inadvertent disclosure, refused to look beyond the "objective fact" that the document was turned over to opposing counsel as part of document production ". . . to determine whether the [party] really intended to have the document examined." The Court reasoned that regardless of whether production was "inadvertent" or not, the "confidentiality" of the document was "breached" by the

---

**3.** The Affidavit Of Robert Stillman (# 41) and attachments thereto have been impounded by the Court pursuant to an agreement of counsel for the parties.

**4.** Neither of these courts had to decide the issue. In the *Transamerica* case, the Ninth Circuit held that there was no waiver because disclosure had been compelled and "a party does not waive the

attorney-client privilege for documents which he is *compelled* to produce." 573 F.2d at 650–51 (emphasis in original). In the *Standard Financial* case, the Bankruptcy Judge determined that there was no evidence that there was an attorney-client relationship at the time the communication was made, and, thus, no privilege attached to the communication. 77 B.R. at 330.

disclosure, "thereby destroying the basis for the continued existence of the privilege." *Id.* at 549. Magistrate Dwyer seems to follow the decision in *Underwater Storage* in the case of *Chubb Integrated Systems v. National Bank of Washington,* 103 F.R.D. 52, 66–68 (D.D.C., 1984).

Another line of cases follows a middle ground whereby inadvertent disclosures "may" or "may not" result in a waiver of the privilege depending on whether or not the party producing the documents took precautions to protect the privilege. This doctrine seems to have originated in cases in which it was claimed that the privilege was waived when a party or attorney placed the documents in a place where third parties could view them. *In Re Horowitz,* 482 F.2d 72, 81 (2 Cir., 1973), *cert. denied,* 414 U.S. 867, 94 S.Ct. 64, 38 L.Ed. 2d 86 (1973); *In Re Grand Jury Proceedings,* 727 F.2d 1352, 1356 (4 Cir., 1984); *Suburban Sew 'N Sweep, Inc. v. Swiss–Bernina, Inc.,* 91 F.R.D. 254, 258–60 (N.D. Ill., 1981); *O'Leary v. Purcell Co., Inc.,* 108 F.R.D. 641, 644 (M.D.N.C., 1985).

Even though the doctrine does not seem to have originated in cases in which the disclosure was "inadvertent" during the course of a production of documents in litigation, it has been applied to this situation. *Lois Sportswear, U.S.A. v. Levi Strauss & Co.,* 104 F.R.D. 103, 105 (S.D. N.Y., 1985); *Parkway Gallery v. Kittinger/Pennsylvania House Group, Inc., supra,* 116 F.R.D. at 50. (M.D.N.C., 1987); *Liggett Group v. Brown & Williamson Tobacco Corp.,* 116 F.R.D. 205, 207–08 (M.D. N.C., 1986).

I do not find the application of this doctrine to "inadvertent" disclosure during document production in litigation particularly useful. The reason is that the court applying the doctrine to this situation comes quite close to applying a *per se* rule or something akin to the doctrine of *res ipsa loquitur.* Put another way, the opinions of the courts in these cases, after a substantial amount of verbiage, can be reduced to a bottom line to the effect that the precautions were inadequate because they were not effective in preventing the disclosure of privileged documents. If the precautions had been adequate, the disclosure would not have occurred. Frankly, I do not see this result as a significant advance in jurisprudence.

Accordingly, I see little benefit to making a judgment about the adequacy of the plaintiff's precautions. I have indicated where there were deficiencies, but I do not think I am saying any more than that the precautions were inadequate because they were ineffective in preventing the disclosure.

In addition, I see little benefit to doing a painstaking evaluation of the precautions taken by plaintiff's counsel when it is noted that the whole basis for the privilege is to maintain the *confidentiality* of the document. It cannot be doubted that the confidentiality of the document has been destroyed by the "inadvertent" disclosure no less than if the disclosure had been purposeful; it equally cannot be doubted that the confidentiality of the communication can never be restored, regardless of whether the disclosure was "inadvertent" or purposeful. In other words, regardless of how painstaking the precautions, there is no order I can enter which erases from defendant's counsel's knowledge what has been disclosed. There is no order which can remedy what has occurred, regardless of whether or not the precautions were sufficient.

Plaintiff suggests that a protective order be issued prohibiting the defendant from "using" the documents, a sort of "use immunity." I reject the suggestion because I do not see what purpose would be served. Such an order would not restore the confidential nature of the document. The most that can be said is that it would prohibit the defendant's attorneys from using documents to which they were not entitled in the first place. But as I see it, the only reason that the defendant received the document in the first place is because the precautions were insufficient.

In sum, I agree with the Court in the case of *Underwater Storage, Inc. v. United States Rubber Company, supra.* When confidentiality is lost through "inad-

vertent" disclosure, the Court should not look at the intention of the disclosing party. 314 F.Supp. at 549. It follows that the Court should not examine the adequacy of the precautions taken to avoid "inadvertent" disclosure either.

I also agree with the Bankruptcy Court in the case of *In Re Standard Financial Management Corp., supra.* Despite theoretical arguments to the contrary, "... in the real world, unforced disclosure is disclosure and should support the waiver argument." 77 B.R. at 330. "[M]istake or inadvertence is, after all, merely a euphemism for negligence, and, certainly ... one is expected to pay a price for one's negligence." *Id.*

In this latter vein, a strict rule that "inadvertent" disclosure results in a waiver of the privilege would probably do more than anything else to instill in attorneys the need for effective precautions against such disclosure.

Considering all the facts and circumstances, I rule that disclosure [5] of documents protected by the attorney-client privilege in the course of pre-trial discovery in which documents are being produced pursuant to Rule 34, F.R.Civ.P., operates as a waiver of the attorney-client privilege as to any documents disclosed by "inadvertence." I find that such a rule is most consistent with the purposes of the privilege, and the interest of the administration of justice generally.

For all these reasons, it is ORDERED that International Digital Systems Corporation's Motion For Protective Order (# 36) be DENIED.

---

5. That is, disclosure which is not compelled. *See Transamerica Computer Company, Inc. v.*

*International Business Machines Corp., supra,* 573 F.2d at 650.