The **PRUDENTIAL INSURANCE COMPANY,**

v.

**TURNER & NEWALL, PLC, et al.**

**Civ. A. No. 85–2179–H.**

United States District Court,
D. Massachusetts.

June 14, 1991.

---

Walter G. Murphy, Richard J. Riley, Murphy, DeMarco & O'Neill, Boston, Mass. and Charles E. Boulbol, Matthew M. Mosner and Blake Perkins, and Boulanger, Finley & Hicks, New York City, for Turner & Newall.

Randolph L. Smith, Burns & Levinson, Boston, Mass. and Frank H. Griffin, III and Stuart M. Niemtzow, Gollatz, Griffin,

Ewing & McCarthy, Philadelphia, Pa., for Acands, Inc.

Janice M. Meyer, White & Case, New York City, for Prudential.

## MEMORANDUM AND ORDER ON PRUDENTIAL'S AMENDED MOTION FOR PROTECTIVE ORDER (# 594)

ROBERT B. COLLINGS, United States Magistrate Judge.

In the instant case, Prudential seeks damages from the defendants in connection with the use of various asbestos products in the construction of the Prudential Center in Boston. A critical issue is whether or not Prudential's claims were filed within the statute of limitations, and this issue, in turn, depends on when Prudential reasonably should have known of its claims. Accordingly, I have permitted the defendants to take discovery of other Prudential properties at which asbestos problems may have occurred prior to the date on which the statute of limitations began to run.

One of those buildings is named Five Penn Center located in Philadelphia. Prudential has sued other entities in the District of New Jersey in connection with the asbestos in that building as well as in other buildings owned by Prudential. However, as the Court understands the situation, none of the defendants in the instant case are defendants in the New Jersey action.

Until March 14, 1989, Prudential's building manager for Five Penn Center was a firm called Eastman–Arnold Company, Inc. The principals of that company were one Joseph Eastman and one John Arnold. The manager of the properties after Eastman–Arnold was an entity entitled Oliver Realty.

In 1990, defendant AC & S noticed the deposition of Oliver Realty and served a subpoena *duces tecum* on the corporation. This resulted in discussions between counsel for Prudential and counsel for AC & S. As a result of those discussions an agreement was reached which is memorialized in a letter from AC & S' counsel to Prudential's counsel dated May 8, 1990 (Exhibit C to # 601). That letter reads, in pertinent part:

This is to confirm our telephone conversation today which is a follow up to our conversation of April 25 concerning the proposed ACandS deposition subpoena for the custodian of Oliver Realty's records concerning Five Penn Center in Philadelphia. During our April 25 conversation, you told me that any documents predating May 24, 1982 or subsequent documents relating or referring to events prior to May 24, 1982 concerning asbestos materials in Five Penn Center had been produced by Prudential. At that time, I said that, based on your representation, ACandS would be willing to forgo the deposition of Oliver Realty, providing that no such documents had been or were to be withheld based on any alleged privilege. You agreed to determine whether any documents had been withheld and inform me of the results of your inquiry. Today, you informed me that no documents concerning asbestos materials in Five Penn Center or documents relating to or referring to events concerning asbestos materials prior to May 24, 1982 have been or would be withheld based on the assertion of any privilege.

\*    \*    \*    \*    \*    \*

Based on your representations that all Five Penn Center documents either have been or shortly will be produced by Prudential, ACandS will withdraw its deposition notice and will not serve the subpoena on Oliver Realty.

Prudential avers that its representations in the May 8, 1990 letter only referred to documents in Oliver Realty's files and did not refer to documents in either its own files or the files of any entity other than Oliver Realty.

In any event, at some unspecified time but prior to November 29, 1990, Prudential produced all non-privileged documents concerning any asbestos problems at Five Penn Center occurring on or before May 24, 1982. In making that production, Prudential's counsel avers that Prudential had searched its own files as well as the files of Eastman–Arnold.

In early November, AC & S filed a Notice of Deposition of Joseph Eastman, Eastman–Arnold Company, 1617 John F. Kennedy Boulevard, Philadelphia, Pennsylvania for December 6, 1990 at 10:00 A.M. The deposition notice indicated that Mr. Eastman should bring with him all documents within his possession relating to the presence of asbestos at Five Penn Center Plaza. A deposition subpoena issued out of the United States District Court for the Eastern District of Pennsylvania pursuant to the Notice.

Counsel for Prudential received the deposition notice on or before November 9, 1990. Not knowing whether AC & S expected Prudential to produce the witness or whether AC & S was causing a subpoena to issue, Prudential's counsel wrote and inquired. (Exhibit I to #601) It is unclear whether a reply was given. However, on November 12, 1990, Prudential produced documents from Eastman–Arnold's files. In a letter dated November 12, 1990, counsel for Prudential wrote, in pertinent part:

Enclosed are additional documents relating to Five Penn Center that Prudential is producing ...

Certain of these documents were not in Prudential's possession but were located at the offices of Eastman Arnold, which formerly managed the property. Prudential determined that it would be appropriate to send them on to you without requesting that you seek a subpoena.

Exhibit D to #601.

In her affidavit (#597), Prudential's counsel avers that:

9. Counsel for Prudential in the New Jersey litigation had previously represented Mr. Eastman in that case. On November 15, 1990, at a conference held pursuant to former Local Rule 16(d), I told counsel for ACandS that I would advise him as soon as possible as to whether White & Case would represent Mr. Eastman or any of the other subpoenaed witnesses. On November 20, 1990, I advised him that White & Case would represent Mr. Eastman in connection with the subpoena and his deposition, if Mr. Eastman requested us to do so. On November 27, 1990, I in fact did advise counsel for ACandS that White & Case would represent Mr. Eastman.

10. Counsel for ACandS had agreed previously that he would not contact Mr. Eastman or any other Five Penn Center witnesses until we had advised him whether those witnesses wished to be represented by this firm.

Unbeknownst to counsel for AC & S, Mr. Eastman had retired from Eastman–Arnold in 1989. The subpoena was received by John E. Arnold, current President of the corporation, on November 20, 1990. Mr. Arnold, in his Affidavit (Exhibit #6 to #597), states:

4. Upon receiving the Subpoena, I contacted the office of Frank H. Griffin, Esq., of Gollatz, Griffin, Ewing & McCarthy, whose name and telephone number appear on the Subpoena, and informed them that Mr. Eastman is no longer associated with this company, having retired in 1989. At that time, I told them that Mr. Eastman now resides in Haddonfield, New Jersey, and provided them with Mr. Eastman's street address and telephone number.

5. I also told Mr. Griffin's firm that we (Eastman–Arnold) had a small number of documents that I believed were related to the Five Penn Center building as described in the Subpoena. I offered to have documents available for their review.

7. After I contacted Mr. Griffin's office, a Mr. Christopher Churchill visited our offices and took the Five Penn Center documents back to his office to review and copy. The originals have been returned to me.

8. At no time did Mr. Griffin or Mr. Churchill or anyone from their firm ask me whether I was represented by counsel or whether I wished to consult with an attorney before making the documents available to them. Nor did they indicate to me that the Subpoena was directed to Mr. Eastman and that I was therefore not required to respond to it. They also did not tell me who they repre-

sented or what case the Subpoena was related to.

9. Had I realized that the Subpoena did not in fact require me to produce documents, I would not have done so. Had Prudential or Prudential's attorneys requested, I would have allowed them to review the documents before making them available to Mr. Griffin's firm and to withhold any documents they deemed to be privileged.

On November 20, 1990, Mr. Arnold wrote a letter to counsel for AC & S which reads as follows:

This will confirm my conversation with your office relative to the Deposition Subpoena served on Joseph B. Eastman at this address.

As mentioned, Mr. Eastman is no longer associated with this company, having retired therefrom in 1989. His residence is 22 Gill Road, Haddonfield, NJ 08033 telephone 609–428–4329.

So far as documents are concerned, we have a small portfolio of papers which I believe are duplicative of material either originated in or forwarded to the 5 Penn Center Plaza Building when our management agreement for that building was terminated. These are available for your review upon reasonable notice.

Exhibit J to # 601.

On or after receiving the letter, the exact date not appearing in the record, Christopher Churchill, Esquire, of Mr. Griffin's law firm, visited Eastman–Arnold and copied the documents. Prudential first became aware that counsel for AC & S had the documents at a conference before me on November 29, 1990.

On November 27, 1990, when counsel for Prudential advised counsel for AC & S that Prudential's counsel would represent Mr. Eastman, according to Prudential's counsel, Mr. Churchill, on behalf of AC & S, told Prudential's counsel that the law firm representing AC & S had not contacted "any of the potential witnesses." (Exhibit 2 to # 597.) AC & S' counsel's version is somewhat different. Mr. Griffin, in a letter to Prudential's counsel dated December 3, 1990, wrote:

Fifth, when Mr. Churchill told you he had not contacted any of the witnesses to whom subpoenas have been directed, he told you the truth. We had not contacted them then and we have not yet contacted them. The fact that Mr. Arnold, who was not subpoenaed and who was not considered a witness, chose to call us does not change that.

Exhibit 4 to # 597.

Of course, the obvious problem is that each side offers a somewhat different version of what agreements were made. Prudential avers that counsel for AC & S agreed not to contact any of the "potential" Five Penn Center witnesses; counsel for AC & S avers that all it agreed to do was not to contact any of the witnesses to whom subpoenas had been directed. However, even on AC & S' counsel's own interpretation, I think that counsel for AC & S was less than candid when he represented to counsel for Prudential that he had not contacted any of the witnesses to whom subpoenas had been directed. While this might have been literally true, it was certainly misleading since it was crystal clear that the only reason Mr. Arnold was contacting counsel for AC & S was in response to a subpoena to a former officer of the corporation which was addressed to that former officer at the corporation's business address. It is not credible to believe that the documents sought from Mr. Eastman were documents he held in his personal capacity; rather, they were sought from him in his capacity as an agent of the corporation. In the situation in which a present officer rather than the retired Mr. Eastman was responding to that subpoena, it is at best a half-truth to say that counsel for AC & S had not "contacted any of the witnesses to whom subpoenas have been directed." Sharp practices such as this do not advance the stature of the legal profession or the interests of justice and are deserving of criticism.

Be that as it may, I do not resolve the issue before me on this ground. At the time the representation was made, the documents had been disclosed by Mr. Arnold and the fact that Mr. Churchill, by his half-

truth, misled Prudential's counsel after the fact is not determinative.

Similarly, I do not have to resolve the conflict between Prudential and AC & S as to whether counsel for AC & S agreed not to contact subpoenaed witnesses or rather agreed not to contact any potential witnesses respecting asbestos at Five Penn Center. The bottom line is that Prudential had the duty to take steps to protect materials which it considered protected by the attorney-client privilege and/or the work-product doctrine from inadvertent disclosure by it or its counsel and from disclosure by third parties to whom Prudential might have provided materials it considered protected.

Prudential plainly failed in that duty. Either Prudential's counsel or an agent of Prudential's counsel had reviewed the documents in Eastman–Arnold's possession before Mr. Arnold was served with the subpoena; this fact can be readily inferred from Prudential's November 12th letter in which it produced to counsel for the defendants some documents which were not in Prudential's possession but which "... were located at the offices of Eastman Arnold, which formerly managed the property." (Exhibit D to #601). If it had reviewed the documents in Eastman–Arnold's files and determined that the documents were protected, it should have taken steps to insure that the documents would not be disclosed by the persons and/or entity possessing them. In fact, they should have taken those steps at such time as protected material was forwarded to Eastman–Arnold in the first instance.

As I indicated in the case of *International Digital Systems Corp. v. Digital Equipment Corp.*, 120 F.R.D. 445 (D.Mass., 1988), courts have resolved the question of whether unintentional disclosure of protected material results in a waiver in three ways. The first is the "strict accountability" test which I adopted in the *International Digital Systems* case. To the opposite extreme are the holdings of such cases as *Connecticut Mutual Life Insurance Co. v. Shields*, 18 F.R.D. 448 (S.D.N.Y., 1955), *Kansas–Nebraska Natural Gas v.*

*Marathon Oil Co.*, 109 F.R.D. 12 (D.Neb., 1983), and *Helman v. Murry's Steaks, Inc.*, 728 F.Supp. 1099 (D.Del., 1990) to the effect that non-intentional disclosure is never a waiver because for a waiver of a protection to occur, the party must have intentionally given up the protection. The middle ground is illustrated by those cases which determine whether there has been a waiver based upon whether the precautions taken by a party to insure that protected material is not produced were reasonable. *Lois Sportswear, U.S.A. v. Levi Strauss & Co.*, 104 F.R.D. 103 (S.D.N.Y., 1985); *Hartford Fire Insurance Co. v. Garvey*, 109 F.R.D. 323 (N.D.Cal., 1985); *Liggett Group v. Brown & Williamson Tobacco Group*, 116 F.R.D. 205 (M.D.N.C., 1986); *Parkway Gallery v. Kittinger/Pennsylvania House Group, Inc.*, 116 F.R.D. 46 (M.D.N.C., 1987); *Bud Antle, Inc. v. Grow–Tech Inc.*, 131 F.R.D. 179 (N.D.Cal., 1990).

I do not espouse the doctrine that inadvertent or unintentional disclosure can never result in a waiver of the privilege. Whether the "strict accountability" holding of the *International Digital Systems* case is the proper test has been the subject of some discussion in the cases. *Golden Valley Microwave Foods, Inc. v. Weaver Popcorn Co., Inc.*, 132 F.R.D. 204, 206–9 (N.D.Ind., 1990). However, I find that even under the middle ground, waiver has occurred. On the facts as presented, Prudential knew or should have known that the protected documents were in the files of Eastman–Arnold, a non-party with whom Prudential had severed its relationship. However, Prudential did nothing to alert Mr. Arnold or anyone else at the firm that Prudential considered the documents protected and that they were not to be disclosed without Prudential's counsel's consent. Indeed, as Mr. Arnold asserts in his affidavit, if Prudential had in some way warned him that the documents were protected, he would not have disclosed them.

Accordingly, Prudential's motion for a protective order must be denied whether one applies the "strict accountability" test or the "middle ground" test. However, I do not find a waiver beyond the documents actually disclosed; put another way, I do

not find a subject matter waiver. *International Digital Systems Corp. v. Digital Equipment Corp., supra,* 120 F.R.D. at 446, n. 1. *See also Golden Valley Microwave Foods, Inc. v. Weaver Popcorn Co., Inc., supra,* 132 F.R.D. at 208.

For all of the above-stated reasons, it is ORDERED that Prudential's Amended Motion For A Protective Order (# 594) be, and the same hereby is, DENIED.