**McCAFFERTY'S, INC.,**

v.

**THE BANK OF GLEN BURNIE.**

**Civil Action No. MJG–96–3656.**

United States District Court, D. Maryland.

June 11, 1998.

---

Steven E. Tiller, Whiteford, Taylor & Preston, L.L.P., Baltimore, MD, for Plaintiff.

Price O. Gielen, Neuberger, Quinn, Gielen, Rubin & Gibber, P.A., Baltimore, MD, for Defendant.

David B. Hamilton, Ober, Kaler, Grimes & Shriver, P.C., Baltimore, MD, for First Mariner Bank.

## MEMORANDUM AND ORDER

GRIMM, United States Magistrate Judge.

Defendant moves to compel the return of a document it discarded containing attorney-client communications. It argues that the document is privileged and that a third party's retrieval of the document from a trash receptacle located on its property does not vitiate the privilege. I agree, and for the following reasons will require that the document be returned. A hearing is unnecessary. Local Rule 105.6 (D.Md.1997).

## BACKGROUND

In the last six months, First Mariner Bank ("Mariner") has been involved in a high stakes, highly publicized effort to acquire the Bank of Glen Burnie ("BGB").[1] Some of the collateral damage associated with this battle involves a sexual harassment claim against certain high ranking management officials of BGB, filed by Ms. Dorothy Lis, an employee of the bank. In connection with this dispute, Mr. Neil Serotte, an attorney licensed to practice in this state, and hired to represent BGB in connection with the sexual harassment claim, prepared a memorandum discussing certain aspects of the claim. On February 27, 1998, Serotte faxed a draft of this memorandum to Ms. Rebecca Joyner, director of human resources at BGB. After reviewing the memo, Joyner revised it, and faxed it back to Serotte. (Aff. Of Rebecca Joyner, Paper No. 99, Ex. 7). Joyner did not show the draft memorandum to anyone else, and after reading and revising it, she discarded it in a trash can located in her office. Joyner does not recall whether she tore up the memo before throwing it away. *Id.*

At the end of that business day, Joyner's trash can was emptied by custodial staff into a large plastic bag containing other trash from BGB employees. The plastic bag was then placed in a dumpster with other bags of trash. (Aff. Of John E. Porter, Paper No. 113, Ex. 1). The dumpster is located on BGB property and displays a three-foot square sign which states: "This container is for the exclusive use of the Bank of Glen Burnie. Unauthorized use will be prosecuted to the fullest extent of the Law." *Id.* The parking lot where the dumpster is located is for the exclusive use of BGB employees, and there are six three-foot by one-foot signs on the lot which state: "Parking only for employees of the Bank of Glen Burnie. Violators will be towed at owners [sic] expense." *Id.*

On March 2, 1998 at 5:00 a.m., a private investigator employed by Mariner removed numerous bags of trash from BGB's dumpster while engaged in what counsel for Mariner describes—with questionable levity considering the serious issues involved in this dispute—as "the lawful art of dumpster diving."[2] (Paper No. 112 at 2). According to this investigator, the dumpster was not secure, its doors were open, and the trash bags within were visible. The investigator further states that trash from other businesses was found within the dumpster. *Id.*, Ex. B. When describing the Serotte memorandum, and how Mariner's investigator acquired it, Mariner omits the significant fact that the memo had been torn into 16 pieces.[3]

After learning that the Serotte memo was in Mariner's possession, BGB promptly wrote to Ms. Lis' counsel, inquiring whether she had obtained the Serotte memo and, if so, demanding its return. Ms. Lis' counsel responded that his client had not obtained the memo and was unaware of its existence. (Paper No. 99, Ex. 2). On April 9, 1998, BGB wrote to Mariner and inquired whether it had obtained the Serotte memo, and requested that it be returned immediately if it had. *Id.*, Ex. 3. Five days later, counsel for

1. *See* Kevin L. McQuaid, *First Mariner Gains Stake in Arundel Bank; Bank of Glen Burnie Deal Expected to Lead to Bid for Full Control; First Attempt Thwarted,* The Baltimore Sun, Jan. 28, 1998, at 1C; Bill Atkinson, *Glen Burnie Bancorp Tries to Resist Hostile Takeover; 'Poison Pill' Plan OK'd Against First Mariner,* The Baltimore Sun, Feb. 18, 1998, at 3C; Bill Atkinson *Glen Burnie Bankers Sued; Two Shareholders Want Management Out, Receiver Appointed,* The Baltimore Sun, March 3, 1998, at 1C; Bill Atkinson, *Target Bank Sues Hale; Glen Burnie Bancorp Group Claims Illegal Tactics,* The Baltimore Sun, March 11, 1998, at 1C; Bill Atkinson & Greg Schneider, *Legacy Torn Apart,* The Baltimore Sun, March 29, 1998, at 1D; Bill Atkinson, *Glen Burnie Bancorp Drops Hale Lawsuit;` Ex–Director Demyan, 1st Mariner Chairman Failed in Takeover Bid,* The Baltimore Sun, April 30, 1998, at 2C.

2. Counsel for Mariner cites no authority for its contention that "dumpster diving" is legal, either in general, or under the circumstances of this dispute. Nevertheless, as the discussion below makes clear, it is not necessary for me to reach this issue, and nothing in this opinion should be taken as indicating any view of the Court as to the legality of the actions taken by Mariner's investigators in this case.

3. Because the original Serotte memo recovered by Mariner's investigator was filed with chambers as an exhibit in this action under seal, BGB could not have learned that it had been torn up by Joyner before being discarded. Joyner's affidavit, however, suggests that she suspected as much, but was unsure.

Mariner responded that his client had obtained the Serotte memo as part of an investigation in connection with anticipated and/or existing litigation with BGB. Mariner refused to voluntarily return the memo to BGB as demanded, however, and recommended that BGB move to compel return of the memo in connection with the pending litigation.[4] *Id.,* Ex. 4. BGB followed this suggestion, and on April 16, 1998, filed a letter motion with this Court requesting that the Court Order that the document be returned.[5] The following day, I issued a Memorandum and Order requiring that certain measures be taken to preserve the confidentiality of the Serotte memo, and directed that counsel brief the issues raised in BGB's motion. (Paper No. 100). The issue has been briefed in papers 99, 112, and 113 and is now ripe for resolution.

## LEGAL ANALYSIS

Although the law which governs the outcome of this dispute is well-settled, its application to a fact pattern such as the one presented here appears to be of first impression in this circuit.[6] Indeed, the litigants agree, and my research confirms, that the issue of whether a discarded document can be protected by the attorney-client privilege has yet to be considered in any published federal circuit court opinion and in only one published district court opinion.[7]

■■■ Resolution of the issue begins with understanding the accepted contours of the attorney-client privilege. "The attorney-client privilege is 'the oldest of the privileges for confidential communications known to the common law.' " *United States v. Aramony,* 88 F.3d 1369, 1389 (4th Cir.1996) (quoting *Upjohn Co. v.. United States,* 449 U.S. 383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981)). Its purpose is "to encourage full and frank communications between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Id.* Accordingly, the attorney-client privilege "protects 'not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice.' " *Id.* (quoting *Upjohn Co.,* 449 U.S. at 390, 101 S.Ct. 677). Moreover, given the importance of these underlying public interests, if the privilege applies, it "affords all communications between attorney and client absolute and complete protection from disclosure." *Better Government Bureau, Inc. v. McGraw,* 106 F.3d 582, 600 (4th Cir.1997). Like all other privileges, however, "the attorney-client privilege 'interferes with the truth seeking mission of the legal process,' and therefore is not 'favored.' " *Id.* (quoting *Aramony,* 88 F.3d at 1389).

■■■ To establish the applicability of the attorney-client privilege, the party asserting the privilege must show:

(1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal

4. Mariner is not a party to this litigation. Mariner identified the Serotte memo in a privilege log it served on BGB in response to a subpoena issued by BGB in the present McCafferty's litigation. (Paper No. 99, Ex. 1 at 7).

5. This letter was subsequently incorporated into a motion to compel. (Paper No. 99). In addition to the Serotte memo, BGB seeks the recovery of tape recordings allegedly made of board meetings at BGB which it suspects Mariner possesses. Mariner has denied having any such tapes, and there is no evidence before me which contradicts Mariner's representation. Accord-

ingly, the issue addressed in this Memorandum is BGB's demand for the Serotte memo.

6. The parties do not dispute that in this federal question case, the federal law of privilege applies. *See generally* 3 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 501.02[2][b] (2d ed.1997).

7. *Suburban Sew 'N Sweep, Inc. v. Swiss–Bernina, Inc.,* 91 F.R.D. 254 (N.D.Ill.1981). *Suburban Sew 'N Sweep* was, however, cited with approval by the Fourth Circuit in *In re Grand Jury Proceedings,* 727 F.2d 1352, 1356 (4th Cir.1984).

proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

*Id.* (quoting *United States v. United Shoe Machinery Corp.*, 89 F.Supp. 357, 358–59 (D.Mass.1950)). It is the final element— whether the privilege has been waived— which is at issue in this dispute.[8]

The proponent of the attorney-client privilege has the burden of establishing "not only that an attorney-client relationship existed, but also that the particular communications at issue are privileged and that the privilege was not waived." *United States v. Jones,* 696 F.2d 1069, 1072 (4th Cir.1982). "Any disclosure inconsistent with maintaining the confidential nature of the attorney-client relationship waives the attorney-client privilege." *Id.* And, at least where the disclosure is voluntary, the privilege is waived "not only as to the specific communication disclosed, but often as to all other communications relating to the same subject matter." *Id.*

In addition to waiver by intentional disclosure, the attorney-client privilege can be waived inadvertently. In this regard, three lines of authority have evolved. *See generally* 3 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 503.42[1]–[4] (2d ed.1997). The harshest position—the "strict test"—rarely, if ever, excuses inadvertent disclosure, holding that once confidentiality is lost, it can never be restored. *In re Grand Jury Investigation,* 142 F.R.D. 276, 278 (M.D.N.C.1992) (citing *International Digital Sys. Corp. v. Digital Equip. Corp.*, 120 F.R.D. 445 (D.Mass.1988)). At the other end of the continuum, some courts have held that inadvertent disclosure never waives the privilege because waiver requires an intentional and knowing relin-

quishment. *See, e.g., Mendenhall v. Barber–Greene Co.*, 531 F.Supp. 951, 954–55 (N.D.Ill. 1982). A third line of reasoning takes the middle ground, applying "a 'balancing test' which requires the court to make a case-by-case determination of waiver based upon several factors, including the diligence the party claiming the privilege exercised in seeking to maintain the confidentiality of the documents." *In re Grand Jury Investigation,* 142 F.R.D. at 278.

The Fourth Circuit Court of Appeals appears to have adopted this later middle-ground approach. *Id.* at 279 (citing *F.D.I.C. v. Marine Midland Realty Credit Corp.*, 138 F.R.D. 479 (E.D.Va.1991)). In *In re Grand Jury Proceedings,* 727 F.2d 1352 (4th Cir. 1984), for example, the court emphasized that "the primary requirement, one which has been often characterized as 'the essence' of the privilege, is that the communication was intended to be confidential...." *Id.* at 1355. "In fact, so strong is this requirement of confidentiality," the court noted, "that it has been held that the privilege may be lost 'even if the disclosure is inadvertent' such as in some circumstances 'eavesdroppers,' and again, where if the privileged communication consisted of 'privileged documents,' the party did not 'take reasonable steps to insure and maintain [their] confidentiality.' " *Id.* at 1356 (quoting *Suburban Sew 'N Sweep,* 91 F.R.D. at 254). Quoting Judge Friendly in *In re Horowitz,* 482 F.2d 72 (2d Cir.1973), the court continued,

"It is not asking too much to insist that if a client wishes to preserve the privilege under such circumstances, he must take some affirmative action to preserve confidentiality," ... "Taking or failing to take precautions may be considered as bearing on intent" to preserve confidentiality. In par-

**8.** Mariner argues, without much force, that the Serotte memo is not a privileged attorney-client communication because the text of the memo contains a description of statements attributed to witnesses in connection with the sexual harassment claim which was filed by Ms. Lis. (Paper No. 112 at 8). However, as BGB counters, the Supreme Court's decision in *Upjohn Co. v. United States,* 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981) establishes that, while the facts themselves which are referred to in a confidential communication between an attorney and client are not shielded from disclosure by the privilege, the communication of the attorney to the client reciting those facts is. *Id.* at 395–96, 101 S.Ct. 677. Thus, while in any litigation pending between Mariner and BGB, Mariner undoubtedly can take the depositions of Lis, Joyner and any other person referred to in the Serotte memo, it cannot compel the production of the memo itself, if the attorney-client privilege otherwise applies.

ticular, courts have consistently "refused to apply the privilege to information that the client intends his attorney to impart to others ...," or which the client intends shall be published or made known to others.

*Id.* (citations omitted).

Under this intermediate approach, inadvertent disclosure has been deemed to evidence an abandonment of the requisite intent to maintain confidentiality, and thereby waive the attorney-client privilege, where (1) conversations between attorneys and clients in a public place are overheard by others; (2) there is indiscriminate mingling of attorney-client privileged documents with documents which will be subject to routine disclosure to third persons without having taken precautions to protect the privileged documents from disclosure; (3) privileged documents are stolen or taken because they were not adequately protected; (4) privileged documents are kept in file cabinets routinely used by others; and (5) privileged papers are left in places accessible to the public. Edna S. Epstein, *The Attorney–Client Privilege and the Work–Product Doctrine* 183–190 (ABA Section of Litigation, 3d ed.1997). Examples of the precautions which may evidence a continued intent to maintain attorney-client materials as confidential include: (1) labeling privileged documents as such at their origination; (2) segregating such documents in their own separate files; (3) establishing policies to limit access to privileged materials; (4) shredding, not simply discarding, privileged documents which are no longer needed; and (5) if unauthorized individuals do gain access to privileged materials, taking "immediate remedial steps" to obtain their return. *Id.* at 190.[9]

As previously noted, the decision closest to addressing the issue presented in this dispute comes from the Northern District of Illinois in the *Suburban Sew 'N Sweep* case. In that case, the court addressed whether documents containing attorney-client communications lost their otherwise privileged status where they had been discarded and later recovered by a third party from a trash container. *Suburban Sew 'N Sweep,* 91 F.R.D. at 255. After a thoughtful discussion of this issue, the court ruled that the privilege had been waived. Predictably, Mariner argues that *Suburban Sew 'N Sweep* is on "all fours" with the present case, and the same outcome should result. When *Suburban* is given the careful attention which it deserves, however, it becomes apparent that the facts of this case are distinguishable, and that these distinctions compel an opposite finding.

In *Suburban,* the court began its legal analysis, not with a discussion of the attorney-client privilege, but of the Fourth Amendment. *Id.* at 256. It is important to keep in mind, however, that Fourth Amendment considerations are useful only by analogy because, as the *Suburban* court acknowledged, "it is elementary that the Fourth Amendment and its accompanying exclusionary rule only apply to conduct of or attributable to the government, and normally do not apply in civil cases." *Id.* Accordingly, contrary to Mariner's view, Fourth Amendment cases which discuss whether or not a person has a reasonable expectation of privacy as to documents or things discarded are not controlling in this case. Rather, their usefulness lies in helping the Court to determine whether or not the discarding of privileged communications evidences an intent by the holder of the privilege to abandon the confidentiality which is necessary to sustain the privilege, and for assessing whether or not the holder of the privilege took reasonable precautions against inadvertent disclosure to third persons when the privileged information was discarded. As Judge Leighton recognized in *Suburban:*

> It should be noted that the fact that the documents would likely be considered abandoned for purposes of the Fourth Amendment, that defendants probably did

---

**9.** In *In re Grand Jury Investigation,* 142 F.R.D. at 278–79, the court identified the following factors which should be considered in determining whether the circumstances underlying an inadvertent disclosure of attorney-client materials would vitiate the required intent to maintain confidentiality: (1) the reasonableness of the precautions taken to prevent inadvertent disclosure; (2) the number of inadvertent disclosures; (3) the extent of the disclosure; (4) any delay in measures taken to rectify the disclosure; and (5) overriding interests in justice.

not have a reasonable expectation of privacy sufficient to retain a property interest, provides only some, not dispositive, indication that defendants did not take sufficient precautions or reasonably expect that the documents would remain confidential for purposes of the attorney-client privilege. *Id.* at 260, n. 5.

The *Suburban* court also did not hold, as Mariner apparently believes, that whenever privileged documents are discarded, the privilege is automatically lost. To the contrary, the court simply found that under the facts of that case, a "very close question" was presented, and that the scales tipped in favor of finding waiver. *Id.* The court readily acknowledged, however, that had additional precautions been taken by Suburban, such as "destroying the documents *or rendering them unintelligible* before placing them in a trash dumpster," the privilege could be preserved, notwithstanding the fact that the documents had been discarded in a place where there was no reasonable expectation of privacy. *Id.* (emphasis added).

In this case such protections were taken. It is clear from examining the Serotte memo, in camera, that before Joyner threw it away, she tore it into 16 pieces. The significance of this fact cannot be overstated, for it evidences her intent,[10] in the words of the *Suburban* court, to destroy or make the memo unintelligible before it was thrown away. The act of tearing up the memo before throwing it away allows the inference that Joyner intended to preserve the confidentiality of the communication from Serotte, which is the "very essence" of the attorney-client privilege. I conclude, therefore, that Joyner had the required subjective state of mind to maintain the confidentiality of the Serotte memo when she discarded it.

It remains to be determined whether, when objectively viewed, the precautions Joyner took were sufficiently reasonable to warrant a conclusion that the attorney-client privilege has not been waived. The affidavits which have been filed by Joyner and Porter, the CFO of BGB, establish the following. After tearing up the memo, Joyner threw it away into a trash can in her office. Thus, it was not discarded in a readable form in a place generally open to others. From her trash can, the memo was placed into a sealed plastic bag by a custodian, and then, along with other sealed bags of trash taken from BGB, placed into a dumpster which was located within the boundary of BGB's property. The dumpster was conspicuously marked with a sign which stated that it was for the exclusive use of the BGB, and that unauthorized users would be prosecuted. The dumpster was located on a private parking lot, which also was conspicuously posted against unauthorized use by no fewer than six signs. From these facts, I must determine whether it was reasonable for Joyner to have concluded that by tearing up the confidential memo and throwing it away in a private location—from which it would be further mingled with other trash from BGB, before being thrown into a dumpster posted with a warning that it was for the exclusive use of BGB, located on BGB's private parking lot—she was continuing to preserve the confidentiality of the memo against disclosure to third persons. I find that it was.

To be sure, there were additional precautions which Joyner could have taken. As suggested by the court in *Suburban*, BGB could have used a paper shredder. *Suburban Sew 'N Sweep*, 91 F.R.D. at 260, n. 6. Joyner could have burned the pieces of the memo before throwing the ashes away. She could have torn it into smaller pieces, or distributed the pieces into several trash cans in different locations. However, the issue is not whether every conceivable precaution which could have been taken was taken, but whether reasonable precautions were taken. Under the facts of this case, Joyner would have had to anticipate that someone would trespass onto BGB's private property, look through an entire dumpster of trash, remove sealed bags of garbage, sift through them looking for torn up documents, and then piece them together. Even in an age where commercial espionage is increasingly common, the likelihood that someone will go to the unseemly lengths which Mariner did to obtain the Serotte memo is not sufficiently

---

**10.** Her affidavit also confirms her intention to keep the memorandum confidential.

great that I can conclude that the precautions Joyner took were not reasonable. Although the precautions taken in this case were not perfect, they were sufficient to preserve the attorney-client privilege against the clandestine assault by Mariner's "dumpster diver." [11]

## CONCLUSION

In conclusion, I find that under the facts of this case, the circumstances under which Mariner obtained the Serotte memorandum do not result in the waiver of the attorney-client privilege. Accordingly, it is the Order of this Court that:

1. BGB's Motion to Compel the return of the memorandum is GRANTED.

2. Within 10 days of this Order, Mariner and its agents and attorneys will return to counsel for BGB all copies of the Serotte memo, and file an affidavit with this Court certifying that they have done so.

3. The Clerk of the Court shall return to counsel for BGB the original of the Serotte memorandum, which was filed as an exhibit under seal in this action.

---

**11.** I also find that application of the five factors discussed by the court in *In Re Grand Jury Investigation*, 142 F.R.D. at 279, produces the same result: (1) Joyner's actions to preserve the confidentiality of the memo were reasonable; (2) there was but a single disclosure; (3) the disclosure was limited in scope; (4) there was no delay in measures taken by BGB to rectify the disclosure once it was discovered; and (5) interests of justice militate against a finding of waiver given the facts of this case.